**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 28 2014, 11:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE INDIANA
DEPARTMENT OF CHILD SERVICES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Office of the Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR COURT APPOINTED
SPECIAL ADVOCATE:

**JENNIFER A. JOAS**
Joas & Stotts
Madison, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE INVOLUNTARY )
TERMINATION OF THE PARENT-CHILD )
RELATIONSHIP OF K.B., MINOR CHILD, )
AND HER MOTHER, M.B., )
    )
M.B., )
    )
    Appellant-Respondent, )
    )
    vs. )    No. 69A05-1305-JT-230
    )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )

)
)

---

APPEAL FROM THE RIPLEY CIRCUIT COURT
The Honorable Carl H. Taul, Judge
Cause No. 69C01-1209-JT-1

---

**January 28, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

Appellant-Respondent M.B. ("Mother") appeals the juvenile court's order terminating her parental rights to K.B. K.B. was removed from Mother's care after the Department of Child Services ("DCS") received a report that Mother had been arrested on a warrant for neglect of a dependent and that there was no appropriate caregiver for K.B. On appeal, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. Concluding that the evidence was sufficient to support the termination of Mother's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

K.B. was born to Mother on September 30, 2009.[1] With respect to K.B., DCS became involved with the family after receiving a report on May 1, 2010, that Mother had been arrested on a warrant for Neglect of a Dependent. When K.B. was found, she was dirty and had a pungent odor, K.B. was found in a room that had a strong smell of marijuana and

---

[1] The identity of K.B.'s father is unclear from the record on appeal, and the termination of father's parental rights is not at issue in this appeal.

contained drug paraphernalia, and there were no appropriate caregivers for K.B.[2]

A few days later, on May 5, 2010, DCS filed a verified petition alleging that K.B. was a child in need of services ("CHINS"). On May 24, 2010, the juvenile court held a hearing during which Mother admitted to all but the drug-related allegations in the CHINS petition. The juvenile court adjudicated K.B. to be a CHINS. The juvenile court issued a dispositional order and parental participation decree on June 21, 2010, in which it ordered Mother to complete certain services.

On August 6, 2010, the juvenile court suspended Mother's visitation at the Dearborn County Jail, due to the trauma it placed on K.B. On December 8, 2010, the juvenile court held a review hearing during which it determined that in light of Mother's failure to cooperate with DCS or participate in K.B.'s case plan, DCS was no longer required to make reasonable efforts to reunify K.B. with Mother. During a January 4, 2011 permanency hearing, the juvenile court found that Mother had not participated in services. At this time, the juvenile court changed the permanency plan for K.B. to termination of Mother's parental rights and adoption. On May 17, 2011, the juvenile court found that although Mother had participated in some counseling sessions, the permanency plan for K.B. should continue to include adoption because Mother had failed to participate in home-based services to address parenting issues and drug education.

On December 20, 2010, DCS filed a petition seeking the termination of Mother's parental rights to K.B. The juvenile court denied this termination petition. On November 15,

---

[2] It was also noted that Mother had a substantial history with DCS that included prior substantiations for lack of supervision and neglect as well as the termination of her parental rights to numerous other children.

2011, the juvenile court changed the permanency plan to concurrent plans of reunification and termination given the denial of the December 20, 2010 termination petition, and ordered Mother to participate in reunification services.

After receiving reports that K.B. was regressing and not talking, on January 27, 2012, the juvenile court issued an order decreasing the frequency and intensity of Mother's visits with K.B. until K.B. became "more used to seeing and interacting" with Mother. Appellant's App. p. 191. On February 24, 2012, the juvenile court appointed Tonya Richter as K.B.'s court appointed special advocate ("CASA") and guardian ad litem ("GAL").

On May 2, 2012, the juvenile court ordered Mother to undergo a psychological evaluation after it found that although Mother was attending services consistently, her behaviors had become erratic and she did not fully understand K.B.'s needs or age-appropriate behaviors. On August 24, 2012, the permanency plan for K.B. was again changed to adoption based on Mother's failure to cooperate with the case plan. Visitation continued despite concerns regarding Mother's behavior. Visitation was suspended on November 15, 2012, "to protect [K.B.] from [Mother's] behaviors" after Mother failed to modify her behaviors despite repeated warnings. DCS Ex. 21, ¶ 11.

On September 12, 2012, DCS filed a second petition seeking the termination of Mother's parental rights to K.B. On March 11, 2013, and March 14, 2013, the juvenile court conducted an evidentiary termination hearing at which Mother appeared and was represented by counsel. During the termination hearing, DCS introduced evidence relating to continued concerns regarding Mother's inability or refusal to properly care for K.B., as well as

Mother's failure to participate in or benefit from the services offered by DCS. DCS also introduced evidence indicating that termination of Mother's parental rights was in K.B.'s best interests, and that its plan for the permanent care and treatment of K.B. was adoption. Mother presented evidence which she claimed demonstrated that she was beginning to make progress and, as such, should be given more time before her parental rights were terminated. Following the conclusion of the termination hearing, the juvenile court terminated Mother's parental rights to K.B. Mother now appeals.

**DISCUSSION AND DECISION**

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired

5

before terminating the parent-child relationship. *Id.*

## I. Sufficiency of the Evidence

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
> > (i) the child has been removed from the parent for at least six (6)

6

months under a dispositional decree;

(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Specifically, Mother claims that DCS failed to establish that either (1) the conditions that resulted in K.B.'s removal or the reasons for K.B.'s continued placement outside of her care will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of K.B. Mother also claims that DCS failed to establish that termination of her parental rights was in K.B.'s best interests.

**A. Conditions Resulting in Removal Not Likely to Be Remedied**

On appeal, Mother argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in K.B.'s removal from and continued placement outside her care will not be remedied. Mother also argues that DCS failed to establish by

7

clear and convincing evidence that the continuation of the parent-child relationship poses a threat to K.B. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find *either* that the conditions resulting in removal will not be remedied *or* that the continuation of the parent-child relationship poses a threat to K.B. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where, as here, the juvenile court specifically finds that there is a reasonable probability that the conditions which resulted in the removal of the child from or the reasons for the continued placement of the child outside of the parent's care would not be remedied, and there is sufficient evidence in the record supporting the juvenile court's conclusion, it is not necessary for DCS to prove or for the juvenile court to find that the continuation of the parent-child relationship poses a threat to the child. *In re S.P.H.*, 806 N.E.2d at 882.

In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place K.B. outside of Mother's care or to continue K.B.'s placement outside Mother's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside her parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct.

App. 1997).  The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation.  *Id.*  A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing.  *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).  Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'"  *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).  The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change."  *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for K.B.'s continued placement outside of Mother's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record.  In support of its determination that there is a reasonable probability that the conditions which resulted in K.B.'s removal from Mother's care will not be remedied, the juvenile court made a number of findings, some of which Mother now claims are clearly erroneous.

With respect to K.B.'s continued placement outside of Mother's care, the juvenile court found as follows:

9

11.     After formal removal of [K.B.] per the Dispositional Decree of June 21, 2010, [K.B.] was never returned to [Mother's] care and custody.

****

13.     Mother and [K.B.] began therapeutic supervised visits at the end of January 2012. Jodi Alexander and Stacy Cornett from Community Mental Health Center supervised the visits and worked on skill building with Mother and [K.B.] during the visits.

14.     The visits between Mother and [K.B.] went well in the beginning. However the supervisors would have to intervene occasionally due to Mother having inappropriate age expectations. Mother was initially receptive to these interventions.

15.     Supervised visits were originally at the DCS office, but then transitioned to [Mother's] home. It was after the transition to Mother's home that the visits began to deteriorate.

16.     The first three months of supervised visits the supervisors were very hands on, modeling parenting skills for Mother and intervening. The team decided that at the end of March 2012 or the beginning of April 2012 the modeling was going to back off and Mother was going to be more in charge of the visits.

17.     During the visits, [K.B.] would go to the adults supervising the visits to meet her needs instead of to Mother. This would upset Mother and she would tell [K.B.] that if she treats [Mother] that way then [Mother] will treat her the same way.

18.     There were growing concerns as the visits progressed. [Mother] engaged less as the visits went on; there was a visit where Mother spent a lot of time on the phone. Mother would also respond inappropriately with comments [K.B.] made; [K.B.] would say "I want to go home" and Mother would respond "I love you too." Mother had difficulty parenting the baby that was in her care and [K.B.] simultaneously during the visits. Mother would also criticize [K.B.] during the visits. Further, [K.B.] resisted going into the visits and would scream and cry.

19.     Mother expressed that she believed in blind obedience in that she felt that she should only have to tell [K.B.] one time what she wanted her to do and that it was unacceptable if [K.B.] did not follow the instruction.

20.     In June 2012 the visits began being supervised by Crystal Berberich from Community Mental Health Center and Michelle Jury the Family Case Manager and were transitioned to the Park in Versailles due to the visits not being successful at [Mother's] home.

21.     At the park, Mother would bring up topics that were not appropriate to deal with in front of [K.B.], but would often continue to bring them up even after the supervisors asked that she stop those conversations. Mother was

directed to look at [K.B.'s] face because [K.B.] was upset and Mother would say that she (Mother) was calm.

22. A warning system was implemented wherein the visit would terminate after Mother was given multiple warnings to provide Mother with clear guidelines.

23. As the visits progressed [K.B.] showed some concerning behaviors. [K.B.] would not want to get out of the vehicle for the visits to start and would on occasion have to be forced into the visit. [K.B.] also expressed that Mother would pinch her under a blanket and whisper hateful and negative comments to [K.B.]. [K.B.] was provided therapeutic play after visits to help her stress levels during the visits. During these, [K.B.] refused to talk about Mother and when brought up by the therapist would refer to her as "Mean [Mother]." [K.B.] also vomited at a visit after Mother provided snacks. The visitation supervisors enacted rules for the visits after these concerns were brought to their attention. [K.B.] was not to be covered by a blanket during the visits. [Mother] was not to whisper to [K.B.]. Lastly, no food or drink was to be brought to the visits.

24. [K.B.] was diagnosed with Reactive Attachment Disorder and disruptive reactive disorder. And her behaviors, although typical in some respects to a normal toddler also required additional skills and techniques beyond those needed for a normal toddler. Attempts were made to model and teach those to Mother, but she was unreceptive.

25. DCS had the recommendation of completing Skill Building with [K.B.] and Mother to work with Mother on parenting and dealing with [K.B.'s] behaviors. The Skill Building was going to include Foster Mother in order for her to share what works for her when dealing with [K.B.]. Originally, Skill Building was going to occur at the Foster Parent's home, but Mother refused. DCS was going to move it to Mother's home, but Mother still refused. Finally, it ended up occurring at the DCS office, but shortly after it started, Mother blew up towards the Foster Mother and stated that she did not need help parenting her child all she needed was for [K.B.] to be returned. Mother stormed out of the DCS office.

26. In the end of August and beginning of September, the visits began to sharply decline and many of the visits were terminated early.

27. The last visit occurred in September and at that visit and Mother became verbally aggressive towards Family Case Manger Michelle Jury. Family Case Manager told Mother that they were going to have to terminate the visit and went to get [K.B.] out of the swing. Mother went and took [K.B.] out of the swing and would not put her down. [K.B.] was clearly under distress asking to go home and saying that she wanted her mommy, referring to the foster mother. Family Case Manager told Mother that she would have to call the Police if Mother would not give [K.B.] back, Mother refused. The

Police were called and Mother finally put [K.B.] down only when the Police arrived.

**\*\*\*\***

30. In May 2012 Mother on her own signed up for a volunteer program with Healthy Families Indiana and was assigned Joyce Consley as her worker.

31. Through Healthy Families Mother was able to gain parenting knowledge for her child. When Mother filled out the paper work that involved current parenting knowledge Mother would answer with what she felt was the right answer, but when talking through the skills, Mother's true answer was generally developmentally inappropriate. Mother had unrealistic ideas of the development of a child.

32. Mother was unable to focus on the Healthy Families program and demonstrated paranoid behavior. Mother stated that DCS was out to get her and had put cameras in the walls of her home to watch her. Mother also stated that the United States Postal Service was intercepting her mail and that the maintenance man at her building was watching her for the foster parents.

33. Mother did not learn anything from the program. The Healthy Families caseworker has no knowledge of whether Mother followed up on the recommendations due to terminating her case because of Mother's paranoia.

34. Mother testified that she no longer uses drugs and there was no evidence presented to controvert that testimony.

35. Of some concern, however, was Mother's testimony that she would not have [her] father, a convicted sex offender, watch [K.B.] or her other child merely because he was currently too ill to watch children. Mother has been unwilling to address her own past abuse, including alleged sex abuse by her father, and Mother appears to not understand why her father might not be a good caregiver for her children.

36. In July and August of 2012 Mother met with Dr. Linda McIntire to have a parenting and psychological evaluation. Mother was dishonest and invalidated many of the testing instruments due to her trying to show herself in a better light and telling people what she believes they want to hear.

37. Based on the testing that Dr. McIntire administered with Mother, it appears that Mother is paranoid, rigid, easily irritated and retreats to fantasy. Mother has a negative approach to the world and felt that the world was out to get her.

38. Mother is diagnosed with Axis Two personality disorder with borderline intellectual functioning. Based on this diagnosis Mother is narcissistic, anti-social with a disregard for the law and places her own needs above others. This is a chronic condition that needs continuing treatment, and significantly decreases her ability to raise a child. Mother has no ability to notice a child's needs and cannot parent a child with [K.B.'s] special needs.

12

39. Mother displayed all of these behaviors in the dates Mother was at Dr. McIntire's office, particularly that Mother stormed out of each meeting after not getting what Mother wished or being caught in lies. Further, Mother was unable to read the cues of her infant while at Dr. McIntire's office, allowing the child to cry while Mother screamed at Dr. McIntire and later noting that the child might be hungry.

40. Throughout most of the case, Mother put her desires before [K.B.'s] needs; Mother was not open to learning from service providers and taking direction from them as to improving her parenting abilities in order to effect reunification. She has anger issues, especially as related to dealing with foster mother and Family Case Manager and at one time had to have the Police called to a visit with [K.B.] due to her unwillingness to return [K.B.] to the caregiver. Mother would criticize [K.B.] and whisper negative comments to [K.B.]. Mother had expectation of [K.B.] which were beyond [K.B.'s] age and abilities. In general, although appropriate behaviors were consistently modeled for Mother, Mother failed, refused, or was unable to benefit from the services provided. When Mother showed some improvement, it was for short periods, and Mother would regress to her prior conduct; as evidenced by Mother's dealing with service providers, as well her regressive behavior demonstrated during supervised visits.

41. Throughout the underlying CHINS' case, Mother did not demonstrate that she was ready and able to parent [K.B.]: Mother was resistant to services, was not forthcoming with information, failed to complete services, and failed to demonstrate an ability to benefit from services she had received.

42. During the supervised visits between [K.B.] and Mother [K.B.] began to regress at the end of those visits. [K.B.] had tantrums after the visits, would not want to go to the visits and was at one time potty trained and regressed and was no longer using the toilet.

43. No service provider was ever able to recommend that Mother and [K.B.] be reunified. This was either because Mother failed to improve her parenting abilities and demonstrate that she was able to care for [K.B.], or because she always put her own needs above the needs of [K.B.] or both.

Appellant's App. pp. 424-26; Appellant's Br. pp. 40-45. In light of these findings, the juvenile court concluded that DCS established by clearing and convincing evidence that the reasons for K.B.'s continued placement outside Mother's home would not be remedied. In making this conclusion, the juvenile court "particularly note[d]" that:

a. The visits were stopped between [Mother] and [K.B.] due to Mother's failure to follow safety plans and visit plans.

b. That it was also testified to that Mother has a personality disorder that would render her highly unlikely to be able to raise a child without special needs let alone a child like [K.B.] who has special needs.

c. [K.B.] was removed in part due to Mother wanting [K.B.] to go to inappropriate caregivers. Mother still shows a lack of understanding who is an appropriate or inappropriate caregiver and why they are or are not appropriate caregivers.

Appellant's App. pp. 428-29; Appellant's Br. pp. 47-48.

In challenging the juvenile court's findings, Mother does not challenge many of the specific findings set forth by the juvenile court. Instead, Mother argues that the juvenile court's general determinations that her visitation with K.B. was stopped due to her failure to follow safety and visit plans, that her personality disorder renders her unlikely to be able to raise a child with K.B.'s special needs, and that she continues to show a lack of understanding as to who is an appropriate caregiver are not supported by the evidence. In support, Mother points to evidence that she claims proves otherwise. However, despite Mother's claim to the contrary, upon review, we conclude that the record establishes that Mother's visitation with K.B. was stopped due to her failure to follow safety and visit plans, that her personality disorder renders her unlikely to be able to raise a child with K.B.'s special needs, and that she continues to show a lack of understanding as to who is an appropriate caregiver.

**1. Evidence Relating to Termination of Mother's Visitation with K.B.**

The record reveals that Mother has a long history with DCS. Mother's parental rights to six other children have previously been terminated. However, despite this long history,

14

Mother has failed to respond to services in a manner which would allow for K.B. to be returned to Mother's care.

With respect to K.B., Mother initially displayed positive interaction during her visits with K.B. and seemed to be making progress. In light of this progress, visits were moved from the DCS office to Mother's home. However, shortly after the home-based visits began, "things kind of started going down hill." Tr. p. 32.

Multiple service providers indicated that they had many concerns regarding Mother's behavior during visits. Specifically, the service providers expressed a concern over the high level of agitation that Mother exhibited during visits. Mother was often uncooperative during visits and would often use a loud tone of voice and appear angry. On several occasions, Mother indicated that she believed in "blind obedience," meaning that children should blindly listen to her on the first time of being told something and would become agitated "pretty instantly whenever [K.B.] wanted … to respond" or failed to "listen directly whenever [Mother] would say something." Tr. p. 39. CASA Richter indicated that out of approximately twenty visits, there were only three visits that did not include concerning behavior.

Mother also expressed an unwillingness to work with the service providers and often accused the service providers of lying. Mother asserted that she did not need assistance and that "she just needed [K.B.] back." Tr. p. 31. Case Manager Jury expressed that, at times, she became concerned that Mother might hit her. In addition, Case Manager Jury expressed concerns for DCS staff due to Mother's behavior. At some point prior to the termination

15

hearing, it became necessary for the DCS clerical staff to keep the office lobby and receptionist area locked at all times because Mother would come into the office "yelling and screaming." Tr. p. 41. In addition, CASA Richter stopped having one-on-one sessions with Mother because she was argumentative and combative.

Following a visit in April of 2012, K.B. reported an incident that had occurred while Mother and K.B. were in the bathroom of Mother's home together, without supervision, for approximately twenty minutes. K.B. reported that Mother pulled K.B.'s pants down and was looking at her. A safety plan was subsequently put in place by which Mother could not be in a room with K.B. without supervision. After the bathroom incident occurred, K.B. indicated that she was scared of Mother and was especially scared of Mother's bathroom. K.B. soon thereafter began throwing tantrums and expressed a reluctance to attend visits with Mother.

Visitation was subsequently moved from Mother's home to a park. A safety plan was eventually put in place which provided that Mother could no longer lie under a blanket with K.B. following complaints from K.B. that Mother was pinching her under the blanket. Another safety plan provided that Mother could not provide K.B. with any food or drinks during visits after K.B. fell ill following a visit during which Mother had provided her with food. Yet another safety plan provided that Mother could not whisper into K.B.'s ear after complaints from K.B. that Mother would whisper mean or inappropriate comments to K.B. Mother was especially verbally aggressive during the last visit between Mother and K.B. when police had to be called to diffuse the situation. During this visit, Case Manager Jury became concerned for K.B.'s safety after Mother picked K.B. up out of a swing and would

16

not put K.B. down, despite K.B.'s requests that she do so. Mother did not put K.B. down until the police arrived. At the end of September of 2012, following this incident, visitation was suspended due to concerns for K.B.'s safety and Mother's inability to follow the safety and visitation plans.

The evidence supports the juvenile court's determination that Mother's visits with K.B. were terminated due to Mother's failure to follow safety and visit plans. Further, although Mother points to evidence which she claims indicates that her visits with K.B. most often went well, it was within the province of the juvenile court, as the finder of fact, to minimize any contrary evidence of changed conditions in light of its determination that the conditions that have resulted in K.B.'s continued removal from Mother's care were unlikely to change. *See In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*.

### 2. Evidence Relating to Mother's Inability to Parent Due to Mother's Personality Disorder

The record reveals that Mother suffers from a personality disorder that renders her unable to care for K.B.'s special needs. Specifically, Dr. Linda McIntire, a psychologist who treated Mother, testified that Mother's "ability to parent a normal, healthy child without behavioral or affective concerns is grossly compromised at best. But her ability to parent a child [with K.B.'s special] emotional needs … is even more compromised. I don't believe that she can do it." Tr. p. 130. Dr. McIntire testified that it would be difficult for Mother to tune into K.B.'s needs. Dr. McIntire further testified that it was difficult to analyze Mother's abilities due to Mother's lying. In addition, Dr. McIntire opined that it would be "years if ever" before Mother would be able to parent K.B. Tr. p. 146. Mother displays outbursts and

17

periods of paranoia. Mother also displays an ongoing disregard of rules, laws, or expectations of others; a lack of empathy, an inability to connect with others, and an inability to put others before herself. This evidence supports the juvenile court's determination that Mother's personality disorder would render her highly unlikely to be able to raise K.B. and provide for K.B.'s special needs.

### 3. Evidence Relating to Mother's Lack of Understanding of Who Makes an Appropriate Caregiver

The record reveals that Mother has a long history of leaving her children with inappropriate caregivers. In the instant matter, Mother claimed that her father would make an appropriate caregiver despite the fact that he had previously been arrested, prosecuted, and served time for sexually abusing Mother and her siblings. Mother indicated that she had no concerns about her father watching her children. Further, at the time when K.B. was first removed from Mother's care, Mother wanted to have K.B. left with her brother, who, at the time, appeared to be under the influence of drugs and had a prior substantiation for sexual abuse allegations. This evidence supports the juvenile court's determination that Mother demonstrated a lack of understanding of who makes an appropriate caregiver and why they are or are not an appropriate caregiver.

Furthermore, while the record indicates that the juvenile court considered the evidence presented by Mother in support of the progress that she claimed to be making, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525

18

N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. We conclude that the evidence, when considered as a whole, is sufficient to demonstrate a reasonable probability that the reasons for K.B.'s continued removal from Mother's care will not be remedied. Mother's claim to the contrary effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in K.B.'s removal would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to K.B.'s well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## B. K.B.'s Best Interests

Next, we address Mother's claim that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in K.B.'s best interests. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

> In so doing, the trial court must subordinate the interests of the parent to those of the child. [*McBride*, 798 N.E.2d at 203.] The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id*. Moreover, we have previously held that the recommendations of the case

19

manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

*In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). A child's need for permanency is an important consideration in determining the best interests of a child. *In re A.K.*, 924 N.E.2d at 224. Additionally, a parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of the parental rights is in the best interests of the child. *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007).

In the instant matter, both Case Manager Jury and CASA Richter testified that they believed that the termination of Mother's parental rights was in K.B.'s best interests. Specifically, CASA Richter testified that she believed the termination of Mother's parental rights was in K.B.'s best interests because she does not feel as if there is any indication that there would be anything resolved for K.B. "if it were to go any other way." Tr. p. 330. CASA Richter explained that K.B. had been removed from Mother's home for three years, Mother is currently unable to care for K.B. due to her personality disorder, and K.B. would be required to remain "in the system" for a long time if she were to wait for Mother to be capable of providing appropriate care. Tr. p. 325. CASA Richter also testified that she believed that at this point, it would be traumatic for K.B. to be removed from her foster parents' home. In addition, both Case Manager Jury and CASA Richter expressed concerns about Mother's ongoing lack of stability.

The juvenile court did not have to wait until K.B. was irreversibly harmed such that

20

her physical, mental, and social development was permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of Case Manager Jury and CASA Richter, considered with the totality of the evidence, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Mother's parental rights is in K.B.'s best interests. Again, Mother's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

Having concluded that the evidence was sufficient to prove the statutory requirements set forth in Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

MATHIAS, J., and PYLE, J., concur.